SMITH, State Superintendent of Banks, Respondent,
v. GROESBECK, Appellant.

(223 N. W. 308.)

(File No. 5984.   Opinion filed January 26, 1929.)
(Rehearing denied April 13, 1929.)

*H. A. Doyle,* of Yankton, and *G. M. Caster,* of Lake Andes, for Appellant.

*S. K. Grigsby* and *Davis, Lyon & Bradford,* all of Sioux Falls, for Respondent.

CAMPBELL, J. This action was instituted by the plaintiff to enforce the constitutional and statutory liability of defendant as owner of 20 shares of the capital stock of the Commercial & Savings Bank of Sioux Falls, S. D.; said bank having failed and having been taken in charge by the superintendent of banks, and its assets being insufficient to meet the claims of creditors by much more than the amount of all its capital stock. The complaint pleads everything necessary to establish a good cause of action and demands judgment for $2,000.

To this complaint defendant interposed a lengthy and amended answer, the substance of which is about as follows:

The first paragraph is a substantial admission of the allegations of the complaint in the following words: "That he admits each and every allegation in said complaint contained, except the allegation contained in paragraph III thereof that on January 24, 1924, the defendant was the owner of twenty shares of the capital stock of the said Commercial & Savings Bank, of Sioux Falls, South Dakota, which said allegation this defendant denies, and avers that, while he believes that at said time it did appear on the

books of said Commercial & Savings Bank that defendant was the owner of said twenty shares of the capital stock of said bank, the defendant by reason of the facts hereinafter affirmatively pleaded was not in fact or in law at said time, the owner of said stock or any part thereof, and does not owe to said plaintiff the sum of $2,000, or any part thereof."

The answer then alleges that in June, 1919, "under the supervision and management of John Hirning, superintendent of banks and plaintiff herein," the bank, with its officers and agents, particularly one Edgar G. Wenzlaff, its president, and H. F. McEwen, its cashier, fraudulently and wrongfully conspired to cheat the defendant, and pursuant to said conspiracy and for the purpose of cheating and defrauding defendant and other persons, wrongfully purported to increase the capital stock of said bank from $100,000 to $500,000, without increasing the assets of the bank, and for that purpose issued additional capital stock in the sum of $400,000, it being planned and arranged by the said superintendent of banks and the officers and agents of said bank that said issue of $400,000 should be sold and disposed of to defendant and others, who might be "induced to purchase the same in wrongful, fraudulent, and unlawful manner hereinafter stated"; that upon issuing said additional stock in the amount of 4,000 shares the bank, its officers and agents and the plaintiff, for the purposes of said conspiracy, unlawfully permitted Edgar G. Wenzlaff, president of said bank, to take and receive, and with like intent and purpose he did take and receive 3,915 of said shares so unlawfully issued in his own name, paying to the bank therefor no money or property, "except perhaps a merely nominal amount," but giving to the bank his promissory note for practically the full amount of said capital stock; that thereupon the said Edgar G. Wenzlaff, president of said bank, pursuant to said scheme and conspiracy, placed said capital stock on the market for sale, and became active in the sale and disposition thereof, "acting during all of said time under the supervision of the said John Hirning, superintendent of banks of South Dakota, and under and in pursuance of said fraud, scheme, and conspiracy," and employed high-pressure stock salesmen, "some of whom had been active in the sale and disposition of Midland Packing Company stock throughout the state of South Dakota," and offered said capital stock for sale under grossly fraudulent representations,

all of which representations were known to the conspirators and all of them to be untrue, and were relied upon by defendant and others who purchased stock, and were made for the purpose and with the intention of cheating defendant and other purchasers; that pursuant to said scheme and conspiracy, and with the knowledge and approval of the bank, said Wenzlaff sold a large portion of the stock so issued to him to defendant and others, taking the money and securities paid therefor in his own name, "all of which were, however, the property of said bank"; and the answer then proceeds: "Defendant further states that the said plaintiff herein, the said Edgar G. Wenzlaff, as president of the Sioux Falls Commercial & Savings Bank and the said Commercial & Savings Bank, together with other officers, agents and representatives, conjointly and together, promoted and furthered a gross swindling scheme upon this defendant and numerous residents in and around Armour and Corsica, in Douglas county, South Dakota."

The answer then sets out the various false representations made to defendant "by the said Commercial & Savings Bank and the said E. G. Wenzlaff, its president, and other officers, agents, and representatives in the proposed disposition of said stock," alleging, among other things, that it was represented to defendant that the bank in 1918 earned and paid a 20 per cent dividend; that it was in financial condition to continue so doing; that the dividends from the bank would pay for the stock sold; that the book value and actual value of the stock was at least $200 per share; that all money received from the sale of the stock went into the assets of the bank—and alleges that said representations (and others stated) were relied on by defendant, and were known to the plaintiff, to the bank, and its officers and agents, to be untrue, and were made for the purpose of promoting said fraudulent scheme and conspiracy, and to swindle and cheat the defendant and others; that all the plaintiffs had knowledge of, consented to, and actually participated in, the fraud alleged, and that the plaintiff, superintendent of banks, and the guaranty fund commission of the state of South Dakota and its members, at all times "had full and complete knowledge thereof, consented thereto, and actively participated therein." And paragraph 3 of the amended answer alleges:

"That not only all the plaintiffs herein had knowledge of, consented to and actively participated in the fraud hereinbefore al-

leged, but the. said superintendent of banks and the guaranty fund commission of South Dakota, in whose behalf this action is brought, and its members at all times herein mentioned had full and complete knowledge thereof, consented thereto, and actively participated therein; that to permit the plaintiffs to maintain this action and to recover judgment herein would be to allow them to take advantage of their own fraud; that none of the creditors of the said Commercial & Savings Bank, plaintiff herein, did in fact deal with or extend credit to said bank because of any connection of this defendant therewith, as claimed or alleged in plaintiff's complaint, nor in fact or in law or equity did they or any of them have any right or authority to so do; that on account of defendant's knowledge of and acquaintance with the said Edgar G. Wenzlaff as a banker, as aforesaid, and on account of the fact that the said John Hirning, William Hoese, and Louis Jacobs, members of the guaranty fund commission of South Dakota, who were connected with and participated in all the acts hereinbefore stated, the defendant had great confidence in the honesty and fairness of said transactions, but that forthwith and diligently upon his learning of the fraud practiced upon him, as hereinbefore alleged, he rescinded his said deal and transaction in relation to purchasing and taking said capital stock, and so notified the plaintiff thereof, including the said Commercial & Savings Bank, and made every effort in good faith in like manner to notify the said Edgar G. Wenzlaff, president of said bank, but ever since has been unable by the exercise of all due diligence to find or locate him, the said Edgar G. Wenzlaff, so as to directly notify him also of such rescission, but has been unable so to do for the reason that at said time he, the said Edgar G. Wenzlaff, had absconded from the state of South Dakota and has ever since been, and as defendant is informed and believes, and therefore alleges, now is, a fugitive from justice, and his whereabouts is unknown to defendant; that this defendant has received nothing for said ownership of said capital stock, and the said deal and transaction relating to the purchase of said capital stock by this defendant is and has at all times been void ab initio by reason of the premises hereinbefore alleged, and without any value whatsoever to this defendant, and never had in fact any legal or valid force or existence, was not of any legal, valid, or binding force against this defendant at the time of insolvency of said bank, or for more than one year

next prior thereto, and this defendant neither in fact nor in law is the purchaser or the owner of the capital stock referred to .in plaintiffs complaint; that this defendant, by reason of the premises hereinbefore set forth, is under no legal or binding obligation to pay .any assessments upon the said capital stock."

The answer then proceeds to reallege all the matter previously therein set out, and further that at the time defendant purchased said worthless capital stock, as a result of said fraudulent scheme and conspiracy, he paid "to the said Commercial & Savings Bank through the, said Edgar G. Wenzlaff, its president, the sum of $5,000 in cash or its equivalent, and executed and delivered his promissory note for $5,000, which was transferred in due course to an innocent holder, and which defendant subsequently had to pay, and counterclaims against the bank for said $10,000 less $540 ($300 at one time and $240 on a later occasion) received by defendant as dividends on this stock after he became an owner thereof, pleading that, at the time he "rescinded his said deal and transaction, he offered to pay back and tendered to the said Commercial & Savings Bank said sum of $300 so received by him, but that the said Commercial & Savings Bank refused to accept the same, and stated to the defendant that he would not be released from the said deal and transaction," and, as to the later dividend of $240, that he received it subsequent to said rescission, and that he "did take and apply the same on said indebtedness as he had informed and instructed the said bank that he would do in such event."

The matter coming on for trial in this condition of the pleadings, the allegations of the complaint being admitted, the'burden was upon defendant to establish his affirmative defenses, and defendant claimed and was granted the right to open and close, and thereupon, a jury having been duly sworn, defendant's counsel proceeded, pursuant to trial court rule 23, to "state the issues and the general nature of the evidence he expects to produce in substantiation of the issues by stating what he claims the issuable facts to be," which opening statement was as follows:

"Opening statement of Mr. Doyle: May it please the court, gentlemen of the jury: As has already been indicated to you, this is an action that is brought by the superintendent of banks, John Hirning, acting for the Commercial & Savings Bank, which is the real party in interest in this action. I presume that you know the

successor in office of John Hirning is Fred R. Smith, so that the action is brought by Fred R. Smith, as superintendent of banks, acting for and on behalf of the Commercial & Savings Bank of Sioux Falls, South Dakota.

"The plaintiff in this action, who is on the other side of the table, alleges that we are the owner of 20 shares of the capital stock in this institution, and that by virtue of the law we therefore become subject to an assessment of the par value of that stock in the sum of $2,000, and consequently this action is brought against Mr. Groesbeck to recover this statutory liability in the sum of $2,000.

"The defendant in this action admits that the books of that bank purport to show that he is the owner of 20 shares of the capital stock of that institution, and alleges, and the proof will show, that his subscription to the capital stock in that bank was fraudulently, deceitfully, and wrongfully procured from him. No doubt many of you gentlemen on this jury recall and have heard more or less of the Wenzlaffs, and particularly Edgar Wenzlaff, and the evidence will show that Edgar Wenzlaff used to be a resident of Armour, and that he operated the bank over here, the Citizens' State Bank, I believe it is, and that along during the year 1918 he left the city of Armour and went to Sioux Falls, apparently for the purpose of establishing and organizing or purchasing a new bank, and he did neither at first, I believe over there. He organized what was known as the Farmers' Loan & Trust Bank, and he procured a charter, which is necessary in order to operate a bank. These banks are, in effect, licensed to do business by the state of South Dakota, and he procured a charter for the Farmers' Loan & Trust Bank, but the banking department of this state refused to give him a clearance, and consequently that bank never functioned, and he did sell considerable stock in that bank, and when he failed to get a clearance for that institution, he became connected with what was known as the Stockyards Savings Bank of Sioux Falls, and the Stockyards Savings Bank later on absorbed or became the Commercial & Savings Bank. He bought into the Stockyards Savings Bank and in effect changed the name of it.

"The bank at that time, the Commercial & Savings Bank, which it was known as after that purchase, had a capitalization of $100,000, and the evidence will show that Wenzlaff conceived the

idea of going into this stock selling game that was going on at that time, and he made his application, so we believe, to the proper authorities of the state, and the capital stock of that bank was increased from $100,000 to $500,000. The par value of the stock was $100 a share.

"The evidence will show that prior to this increase there were 1,000 shares of stock in that bank, and after the increase it was increased 4,000 shares in number, making a total then of 5,000 shares and of the par value of $100 a share, which you will see was originally $100,000, and after that time $500,000.

"After this increase, gentlemen, through the activities of Edgar Wenzlaff, this stock was placed upon the market for sale. We will show you that the bank at that time was Wenzlaff and McEwen, and I believe a couple of ladies, constituted the board of directors, and the evidence will show that Wenzlaff and McEwen operated together; that Wenzlaff was the bank and the bank was Wenzlaff. They were, in effect, one and the same, and, when this capitalization was increased, that out of the increase Edgar Wenzlaff purchased practically all of the increase of the stock, that was 4,000 shares. He purchased that himself, according to the records of the bank, and the evidence will show that at the time of the purchase he did not pay for it, except in this manner: That he took the money from the bank; that he had no authority from the bank as a corporation to take the money to pay for this stock, that he did not consult his board of directors, and that they had not given their approval as an entire board; that he had not met any of the requirements of the law to borrow this money as a banker from the bank; that he did not make any report to the superintendent of banks, and that he did not secure it with collateral, as he was required to do, but he simply conspired and operated there with the bank and took the money from the assets of the bank to pay for this stock, and in payment he placed his promissory note in the bank for approximately $390,000 to pay for this increase of the capital stock in the sum of 4,000 shares, and that after he did this he employed what are called 'fiscal agents,' Guthrie and Davis, and, if you understand what is meant by the term 'fiscal agent,' they are agents who contract for the sale of this stock with their principal. Wenzlaff and the bank would be the principal in this case, and the fiscal agents would be these agents; so he entered into a con-

tract with the fiscal agents to go out through the state of South Dakota and sell this capital stock, and these fiscal agents operated to a large extent in Douglas county. Now these fiscal agents had employed under them 20 to 25 subagents, other men whom they had employed to go out and sell this stock. They got for the sale of it a commission of 25 per cent of the sale price of the stock.

"We will show to you through evidence that this stock at the time was represented, and it was stated to Mr. Groesbeck by this bank, by Wenzlaff, through their agents and servants, who were out selling this stock, we will show you that they deceived Mr. Groesbeck, in that they told him that all of this stock was worth $200 a share, that was its actual value; that the bank for a year immediately prior to the sale of this stock had paid a bona fide dividend—that is, a good-faith dividend—in the sum of 20 per cent on its capital stock. If you understand what a dividend means, it is a payment made out of the earnings or the profit of the bank, and these agents told Mr. Groesbeck that this stock for the year before had paid a dividend of 20 per cent. They told him it was worth $200 a share. They told him that the condition of the bank was such that it had so many outstanding good loans that it would continue to pay 20 per cent on its capital stock on each share of it, and by virtue of that Mr. Groesbeck would never be called upon to pay any cash on this, except what had been paid on the original subscription, and whatever notes he gave would be taken care of out of the earnings of the bank, and he would not, in any event, be required to pay any of the cash on this stock, or pay any cash on the interest on his notes, except what was originally paid when it was bought, and the evidence will also show that it was represented to him that all money that was received for this stock went into the assets of the bank, and became a part of the property of the bank; that it became a part of the surplus of the bank, and that they were to have it there to do business on; and that it was also represented to him and stated that this $500,-000. surplus that they were going to accumulate, and the $500,000 capital stock, that they were going to have a $1,000,000 bank in Sioux Falls.

The evidence will show that Mr. Groesbeck is a farmer, who is quite far removed from Sioux Falls; that he had known Edgar

Wenzlaff for a number of years; that he had faith in the statements made to him, that he believed they were true, and that he acted upon them; that, had he known they were false, he never would have signed this subscription, and never have been tangled up in this litigation.

"The evidence will show that these statements and inducements that were made were false, they were not true, and that they were made with the intention and purpose of deceiving Mr. Groesbeck, and that they did deceive him, and that they were false and untrue, in that this stock was not worth $200 a share when it was sold to him, and I believe the evidence will show that it was not worth par value, which is $100 a share, when he bought it for $200 a share.

"The evidence will also show that the bank had not paid a dividend of 20 per cent; that they were lying to him when they told him that, and knew that the bank had not paid a dividend of 20 per cent the year before this stock was sold, and we will also show you that the condition of that bank was such that they knew and should have known that that bank could not continue to pay a dividend of 20 per cent and take up the note that he put up over there, and pay the interest on that from year to year; and we will also show to you that they never got a $1,000,000 bank over there, as they told him they were going to have. They never came anywhere near it, and in effect these statements were all untrue and deceived Mr. Groesbeck.

"We will also show to you that this money that was received for the sale of this stock did not go into the assets of that bank. A large portion of it never became a part of the bank; that it went into the pockets of Edgar G. Wenzlaff and H. F. McEwen. Wenzlaff was president, and McEwen cashier, I believe. We will show that they took $100 a share out of this stock that was sold and they pocketed that.

"We will also show you that during all of these times Hirning, the superintendent of banks, was the active superintendent, and had control and supervision of these institutions, and we will show you that later on this banking department, who is the plaintiff in this action, caused Wenzlaff to return to that bank $102,000 worth of paper and bank stock, the paper of questionable or worthless character, and the bank stock of a similar nature; we will also

show to you that that was not the full amount of the money that they actually took or stole from this bank, or from these stockholders. We will also show you that Hirning told some of these people that he would procure the return of that; that he has never done so.

"In effect, gentlemen of the jury, we will show you that this matter was a conspiracy, and was a scheme on the part of Wenzlaff and this bank to defraud and deceive this defendant and others out of a lot of money.

"The evidence will also show you, gentlemen of the jury, that this man originally subscribed for 50 shares of the stock in this bank, and that he paid and has paid to them at the time and since $10,000, he has paid in all to this bank. The evidence will show that at the time of his subscription along in 1919, he paid them $4,000 in cash and liberty bonds, and gave them a note, I believe, for $6,000, and we will further show to you that, along about the year 1920, a man by the name of William Hoese and another man by the name of Louis Jacobs went into that bank. They went in there as officers and agents of John Hirning. We have in this state, gentlemen of the jury, what is known as the guaranty fund commission, whose business it is to collect and receive certain money from the solvent going banks, and create a fund out of which to pay creditors of defunct and insolvent banks, and that on this commission there was this man Hirning, Hoese, and Jacobs; that they were officers of the state and officers of the department of banking and finance; that they went into the Commercial & Savings Bank, and about that time the capital stock of that bank was reduced, and that Mr. Groesbeck's reduction on his shares ran from 50 shares to 20 shares. They reduced it three-fifths, and so he apparently now is the owner of 20 shares of stock.

"The evidence will also show that Hoese and Jacobs, who were in that bank, represented to this man that this note—I believe it was one $6,000, or two $3,000, notes, I have forgotten which—had been transferred by this bank to an innocent purchaser. In order that you may clearly understand what is known in law as an innocent purchaser, it means the transfer of negotiable paper, such as a promissory note, to some person or bank who pays for it. Mr. Hirning and Mr. Jacobs wrote to this man that his notes, which he had given along with the cash when he bought this stock,

had been transferred to correspondent banks, who were innocent purchasers of these notes, and that the defendant would have to pay them, and Mr. Groesbeck relied upon that and did pay them, and altogether they have received for the 20 shares of stock, which they claim that he holds, the sum of $10,000 in cash.

"The evidence will also show that, when these men, Hoese and Jacobs, went into this bank, their standing was known to this man, their official capacity. He had learned that at that time or shortly afterwards, and he had confidence in what they told him, and because of the fact that he lived a considerable distance from Sioux Falls he relied upon what they told him, and supposed that the same was correct, and when they told him that his notes had been transferred to an innocent purchaser, he believed them, and paid them as a consequence.

"Now the evidence will show that they sort of strung him along like that for a considerable time, and that some time along in the course of the life of that bank he discovered and found out that he had been 'crooked'; that he had been deceived, and they had conspired against him to take his money, and, when he did, he told these two men in the bank, or one of them, I forget which, that they could consider him done with the deal; that they could cancel his stock on the books of the bank, and that he would assume no further duties or liabilities in regard to it. I cannot give you the date of that.

"Mr. Caster: Some time in June, 1921, as I remember.

"Mr. Doyle: And, because of the fact that he had been 'crooked,' it is our contention here, gentlemen of the jury, that this matter never had any legal or valid inception or binding effect on Mr. Groesbeck. He went over there and canceled his stock and offered to return them the certificates of stock, and straighten up with them, and get out of this deal, and because of that cancellation and rescission before this bank became insolvent at all, we feel that the equities of Mr. Groesbeck are superior to anybody, and from that time on his liability ceased in connection with any stockholders' liability lawsuits.

"Now, the evidence will show, gentlemen of the jury, that this bank went into liquidation, or into the hands of the banking department for liquidation—by that I mean, to collect what is there

and pay it out to the creditors—on the 24th of January, 1924, if you recall the situation as it existed at Sioux Falls at that time.

"Now, in addition to that defense which I have stated, this defendant has also, gentlemen of the jury, asked for a verdict from you men for judgment against this bank and this plaintiff, for $10,000, less certain payments which have been made to him, totaling and aggregating $540, and interest on the same since the date of the purchase of this stock. About the 1st of June, 1919, I believe, $4,000 or $5,000 was paid then, and interest on the balance from June 16, 1921, I believe, when he paid the balance of indebtedness that was over there in the form of a note.

"We ask that counterclaim because of the fraud and deceit which I have explained to you before, and we submit, gentlemen of the jury, that if we prove that statement of facts that we are fairly entitled to a verdict at your hands for the defendant on all of the issues in this action.

"The Court: Mr. Doyle, when did he subscribe for this stock?

"Mr. Doyle: June 26, 1919. In addition to this, I would like to also state that, when this bank went into insolvency, shortly after that time, Mr. Groesbeck presented a claim for his $10,000 as a creditor of that bank, and demanded that he be considered as a creditor, and that that sum, or the pro rata share of it, be refunded and paid to him, and that his demand has been refused and consequently the counterclaim is set up in this action asking for judgment for that amount of money."

Thereupon the plaintiff moved for judgment:

"Upon all the records and files in this case, and upon the opening statement of counsel for defendant, for the reason that the opening statement of counsel for defendant, setting forth the facts that they expect to prove, fails to set forth sufficient facts to constitute a defense to this action, or sufficient facts to constitute a counterclaim in favor of this defendant and against this plaintiff."

Thereupon the following additional opening statement was made by counsel for defendant:

"Mr. Caster: The defendant will also prove by his evidence that in June, 1921, while the said Commercial & Savings Bank was still a going concern and regularly engaged in the transaction of the banking business, and some two years and a half before it went into the hands of the superintendent of banks of South Da-

kota for liquidation, he learned that he had been defrauded by the bank and its officers as heretofore stated to you, and forthwith thereupon he went to Sioux Falls, South Dakota, where the Commercial & Savings Bank is located and engaged in the banking business, and saw the president of that bank at that time, who was the active officer and manager of the bank, Mr. William Hoese, and stated to Mr. Hoese that he learned that he had been defrauded in the deal whereby he had purchased the said capital stock of the said Commercial & Savings Bank, and that for that reason he rescinded the deal, the transaction, whereby he had made the purchase, and tendered back to the president of the bank what he had received growing out of the transaction, after the transaction was made, and that at that time he made an effort in all good faith to find also Edgar G. Wenzlaff, who was the president of the bank at the time of the purchase of the stock by him, but he was unable to find the said Edgar G. Wenzlaff, for the reason that he was not anywhere in the state of South Dakota, but some time prior to that he had become a fugitive from justice in the state, and his whereabouts could not be ascertained by the defendant after diligent inquiry, and for that reason, and that reason only, he never gave any direct notice to the said Edgar G. Wenzlaff .

"The Court: Has he that stock at this time, Mr. Caster?

"Mr. Caster: He has the stock. I might say, at the time he learned of the fraud and went to the officer of the Commercial & Savings Bank, he had the stock, took it with him, and tendered it back to the officers of the bank. They refused to take it, and he now has it, and we will tender it into court, for the purpose of surrendering it up to be canceled.

"The Court: I have an impression that Mr. Doyle said something with reference to Superintendent Hirning and Mr. Groesbeck. Was there any negotiations between them with reference to Mr. Hirning's procuring funds that it was claimed by Mr. Groesbeck, or by Mr. Hirning, that were diverted from the Commercial Bank's resources?

"Mr. Caster: I will state, in answer to that, that we do not claim there was any direct transaction between Mr. Hirning and Mr. Groesbeck with reference to that matter.

"The Court: Mr. Groesbeck attended a meeting or some meetings at Mitchell?

"Mr. Caster: Yes.

"The Court: As I have not the statement of Mr. Doyle before me, and it was quite lengthy, it is possible I may confuse something I heard in other cases. I take it, from what has occurred here, that the bank was transacting business right straight along down till the time it closed, a year ago last January?

"Mr. Caster: I so understood, your honor."

Whereupon plaintiff renewed his motion for judgment on all the grounds previously stated, and moved the court to instruct the jury to return a verdict in favor of plaintiff and against the defendant for the amount asked in the complaint. The motion was granted, verdict was directed for plaintiff, and judgment entered thereon, from which judgment, and from an order denying his application for new trial, the defendant has appealed.

It is entirely apparent that defendant could not hope to establish in this action any such counterclaim as he set up in his answer. The action is by the superintendent of banks in behalf of creditors, and in this proceeding, no claim which defendant might have against the bank could be established as an offset or counterclaim. Farmers' State Bank of Lane v. Erickson, 54 S. D. —, 223 N. W. 306, opinion this day filed.

It is also apparent that, if defendant had proved every fact which counsel by their opening statement said would be proved, still no defense would have been established against plaintiff's admitted cause of action. It was conceded that defendant was a stockholder of record of the bank, holding 20 shares of its capital stock, at all times involved in this controversy. Section 8961, Rev. Code 1919, provides in part as follows: "Every bank shall keep a stock book. * * * Such book shall show a full and correct list of the names and addresses of all stockholders in the bank and the number of shares held by each. * * * In all actions, suits and proceedings such book shall be conclusive evidence of the facts therein stated."

It is plain that defendant admits he became a stockholder in 1919, but alleges that he became such stockholder because of fraudulent representations, and that on discovery of fraud, some time in June, 1921, he rescinded the transaction. It is clear that the stock purchased by defendant was originally issued to Edgar G. Wenzlaff, and that defendant bought the same from Wenzlaff, and paid

Wenzlaff for it, and defendant makes no claim whatever that he ever rescinded so far as Wenzlaff is concerned; his statement being that, when he discovered the fraud that had been practiced upon him, he tried to find Wenzlaff, but could not, because he (Wenzlaff) was then a fugitive from justice. Assuming, without deciding, that the opening statement contains matter which might warrant treating the entire transaction as part of a fraudulent conspiracy to such an extent that Wenzlaff could be regarded as merely a nominal party, and to such an extent that it could be held that the stock had really been sold by the bank, although through and in the name of Wenzlaff, and that defendant would therefore have a right to rescind by dealing directly with the bank and disregarding Wenzlaff, nevertheless defendant, according to his own statement, has accomplished no such rescission as would avail him anything as a defense in this case, or as against creditors while he continued a stockholder of record. He says that he bought the stock in 1919, and discovered the fraud in June, 1921. According to his own statement, at that time he went and saw the then president of the bank (who had no connection with the bank at the time of the stock sale), and told him that he had learned that he had been defrauded in the deal whereby he had purchased the stock, and that for that reason he rescinded the deal and tendered back to the president of the bank what he had received. The president refused to accept it. Defendant took his stock certificate away with him, and kept it, continued to be a stockholder of record for at least three years thereafter, and until the failure of the bank, and received and accepted at least one dividend check thereafter, and took no steps, according to his own statement, to have his name removed from the books of the bank as a stockholder, or actually to surrender his stock. Assuming that defendant did everything that he says he did, and that every word of the opening statement as made by his counsel could and would be proved in the case, nevertheless no defense in this action would be thereby established. Farmers' State Bank v. Empey, 35 S. D. 107, 150 N. W. 936.

The only remaining question is whether the learned trial judge erred in granting the motion for directed verdict upon the opening statement and at that stage of the case. There is no question but that such power exists. Undoubtedly it should be

very carefully exercised. The general rule is well stated, we think, in Hyatt on Trials, § 1459, in the following words:

"The general rule is that if the opening statement of plaintiff's counsel clearly shows that there is no cause of action, or that a defense exists, the court is authorized to direct a verdict, or to grant a nonsuit accordingly. The power of the court should not be exercised to direct a verdict or grant a nonsuit on counsel's opening statement unless it clearly appears therefrom that his client cannot succeed in his action or defense. If the litigation can be decided beyond a peradventure upon the counsel's opening statement, there is a growing tendency of the courts to test the matter by the statement without allowing the trial to proceed to its inevitable crisis. It is not to be understood that a client may be judicially penalized because of the ignorance, carelessness, or indifference of his counsel. The statement may be incomplete, indefinite, ambiguous, important facts may be left doubtful, but it must be recollected that the pleadings, not the statements, make the issues, and the court is not authorized to end the case upon the latter's mere inartistic defects and deficiencies, unless some fact is stated clearly which is inconsistent with his client's right of recovery or defense. This is a conclusion, however, seldom reached by the courts. Counsel should be given an opportunity to explain or qualify his statement, always consistent with the truth, and seldom is he unable to relieve the mind of the court from any such ambiguity or indefiniteness which would authorize it to exercise the power to direct a verdict, or grant a nonsuit, without proceeding further with the trial. In some jurisdictions the power of the court is wholly denied. In others it is conceded, but is somewhat limited. It is said that the exercise of the right is improper where the ground is the failure of the opening statement to show the existence of facts which would authorize a recovery, but otherwise, · if the recovery would be against public policy."

See, also, cases collected in note, 29 L. R. A. (N. S.) 218; Abbott Civil Jury Trials (3d Ed.) p. 152; Hornblower v. George Washington University (1908), 31 App. D. C. 64, 14 Ann. Cas. 696, and note page 699.

█ In this case defendant was given every opportunity to make a full and complete statement. He made a further statement after the motion was first made, at which time it is stated in re-

spondents' brief and not denied by appellant, that defendant's counsel was "requested by the court to include in such additional statement all matters in support of his defense and counterclaim, but to include nothing in such statement that he did not in good faith expect to prove." No claim is made now that anything was omitted from the statement, or that greater proof could be furnished than such statement would indicate. If, under such circumstances, defendant is not able to state to the court in honesty and fairness that he will prove, or expects to be able to prove, sufficient issuable facts to establish his affirmative defense, plaintiffs' case being admitted, and the burden being on defendant, we see no good reason why the matter should be carried further, and we think the judgment and order appealed from must be affirmed.

SHERWOOD, P. J., and POLLEY, BURCH, and BROWN, JJ., concur.